**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | Case No. 2:15-cv-00112-RAJ-DEM |
| VIRGINIA ELECTRIC AND POWER | ) | |
| COMPANY d/b/a DOMINION VIRGINIA | ) | |
| POWER | ) | |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT VIRGINIA ELECTRIC AND POWER COMPANY'S
POST-TRIAL MEMORANDUM OF LAW**

Citizen suits are powerful tools, designed to enable citizens to step into the shoes of an agency to enforce violations where the agency fails to do so. But citizen suits can rise no higher than the authority of the agency itself. When the agency, applying its statutory authority, determines that violations are ***not*** occurring, citizen suits are fundamentally inappropriate.

Defendant Virginia Electric and Power Company d/b/a Dominion Virginia Power ("Dominion") is in compliance with all applicable regulatory requirements and permits for Chesapeake Energy Center ("CEC"), and the Virginia Department of Environmental Quality ("DEQ") has repeatedly confirmed that Dominion is in full compliance with its permits. DEQ is responsible for administering the Virginia Pollutant Discharge Elimination System ("VPDES") permit program in Virginia, pursuant to a delegation of authority from the United States Environmental Protection Agency ("EPA"). DEQ has adopted regulations, developed guidance, issued permits and enforced compliance with those permits pursuant to that delegation of authority, as well as state law.

1

Sierra Club alleges that arsenic from Dominion's coal ash ponds and landfill at CEC is being discharged through groundwater to surrounding surface water in a manner that is both (1) unpermitted, and (2) in violation of two general conditions in the VPDES permit issued for CEC (the "VPDES Permit"). But Sierra Club's claims hinge on interpretations of the Clean Water Act ("CWA") and DEQ's regulatory program that are inconsistent with DEQ's own interpretations and practice.

Sierra Club collected no data of its own. Instead, it chose to rely exclusively on data generated by Dominion that was previously submitted to DEQ. Sierra Club presents only circumstantial expert testimony based on this data that because (1) arsenic has been detected in groundwater beneath the CEC site and in data gathered in 2010 from pore water in the sediment near the bottom of the river, and (2) groundwater generally flows radially outward from the site, arsenic originating at CEC must be reaching the river. Dominion disputes that Sierra Club has met its burden to show that arsenic found in the 2010 pore water samples (or otherwise) came from the coal ash at CEC or reached surface water. Def.'s Proposed Findings of Fact ("Dominion FOF") ¶¶ 81-165.[1] But even if Sierra Club's theory were true, it has not established that arsenic is being discharged through a "point source" as is necessary to establish a violation.

Under applicable law, DEQ's approach to permitting at the CEC site is entitled to deference. DEQ does not consider the diffuse migration of pollutants through groundwater to be a point source discharge and, instead, regulates such impacts through the solid waste permit for CEC (the "Waste Permit"). This is consistent with the CWA, Fourth Circuit precedent, and the

---

[1] See also Mem. in Supp. of Def.'s Mot. for Summary Judgment (ECF No. 108) at 6-9; Reply in Supp. of Def.'s Mot. for Summary Judgment at 9-10. Moreover, Dominion continues to challenge that Sierra Club has established standing, as it has failed to establish a nexus between the purported injury to its members and Dominion's alleged conduct. Mem. in Supp. of Def.'s Mot. for Summary Judgment (ECF No. 108) at 27; Reply in Supp. of Def.'s Mot. for Summary Judgment at 18-19.

vast majority of federal court decisions that address the definition of a point source.  In addition, DEQ interprets the VPDES and Waste Permits to be complementary, working in tandem to comprehensively regulate the entire CEC site.  DEQ's decisions reflect the agency's technical expertise and careful balancing of state law and policy.  They are not inconsistent with federal law and thus are entitled to deference.

Even if the Court finds Dominion liable under the CWA, Sierra Club's requested relief is not appropriate. Penalties are not mandatory and would be fundamentally unfair and inappropriate here.  Likewise, excavation and off-site disposal of the coal ash from CEC is an extreme remedy that is not justified.

## ARGUMENT

### I. The Coal Ash Ponds and Landfill at CEC are Not "Point Sources."

#### A. The Coal Ash Impoundments at CEC are Not Discernible, Confined and Discrete Conveyances.

Sierra Club claims that the coal ash impoundments at CEC (along with their associated berms and dikes) are point sources.  But this conflates the sources (*i.e.*, the ponds and landfill) with the conveyances *from* those sources *to* the surrounding surface waters.

The starting point for determining whether Sierra Club has shown that a point source exists is the text of the statute itself.  *Nw. Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063 (9th Cir. 2011) *rev'd on other grounds,* 133 S. Ct. 1326, 1338 (U.S. 2013); *Morales v. TWA*, 504 U.S. 374, 383, (1992) (Scalia, J.) ("The question, at bottom, is one of statutory intent, and we accordingly begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.").

The CWA defines "point source" as:

> Any ***discernible, confined and discrete conveyance***, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling

stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.  This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14) (emphasis added).

Thus, the definition of "point source" under the CWA distinguishes between point and nonpoint sources depending on whether the pollutant is channeled and controlled through a "discernible, confined and discrete conveyance."  *Brown*, 640 F.3d at 1078.  Congress elected to impose permitting requirements only on point sources because "there is no effective way as yet, other than land use control, by which you can intercept [nonpoint] runoff and control it in the way that you do a point source."  117 Cong. Rec. 38825 (Nov. 2, 1971) (statement of Sen. Muskie).  The legislative history makes it clear that Congress was focused on defining "point source" as a conveyance or conduit because that is where treatment could be applied to meet the technology- and water quality-based requirements of the statute.

Various courts have opined that the statutory definition should be interpreted broadly.  *See, e.g.*, *Dague v. City of Burlington*, 935 F.2d 1343, 1354-55 (2d Cir. 1991), rev'd in part on other grounds, 505 U.S. 557 (1992) (*citing United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir. 1979).  But courts have been quick to caution that the phrase "discernible, confined and discrete conveyance" cannot be interpreted so broadly as to read the point source requirement out of the statute.  *See, e.g.*, *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 219 (2d Cir. 2009).

The plain meaning of "conveyance" is "something that carries people or things ***from*** one place ***to*** another."  *Conveyance Definition*, Merriam-Webster.com,  http://www.merriam-webster.com/dictionary/conveyance (last visited July 13, 2016) (emphasis added).   In other

4

words, "conveyance" is the *conduit* between a source of pollutants (*i.e.*, the ponds and landfill) and the receiving waterbody.[2]

## B. The Fourth Circuit, as well as the other Circuit Courts, Require that a Point Source be a Channelized Conveyance.

Consistent with the plain meaning of conveyance, the Fourth Circuit has held that a point source must collect and channel the pollutants and convey them to surface waters. *Appalachian Power Co. v. Train*, 545 F.2d 1351 (4th Cir. 1976). In *Train*, the petitioners sought review of an EPA rule establishing requirements for discharges from electric generating plants. The rule included limits on pollutants in rainfall runoff from areas disturbed by construction and used for material storage (*e.g.*, coal piles). The petitioners argued that these limits were improper because they encompassed storage areas that were not normally routed into a "point source" collection system. The court agreed, ruling: "Broad though this [point source] definition may be, we are of the opinion that it does not include unchanneled and uncollected surface waters." *Id.* at 1373.

The Fourth Circuit's subsequent ruling in *Consolidation Coal Co. v. Costle*, 604 F.2d 239 (4th Cir. 1979) *rev'd on other grounds sub nom. EPA v. Nat'l Crushed Stone Ass'n,* 449 U.S. 64, 84 (U.S. 1980), is consistent with *Train*. In *Costle*, the petitioners sought review of an EPA rule establishing requirements for discharges from coal mining operations. The rule included limits on discharges from coal preparation plants and associated areas, which EPA defined to include "coal preparation yards, immediate access roads, slurry ponds, drainage ponds, coal refuse piles, and coal storage piles and facilities." The petitioners argued that these limits were improper

---

[2] Sierra Club asks the Court to find that the ponds and landfill at CEC are themselves point sources, but neither "pond" nor "landfill" is listed among the examples in the statutory definition, and neither is a "carrier" of material from one place to another. To the contrary, both are "keepers" designed to keep material in place. "A word is known by the company it keeps – that is to say, which of various possible meanings a word should be given must be determined in a manner that makes it 'fit' with the words with which it is closely associated." *James v. United States*, 550 U.S. 192, 222-23 (2007) (Scalia, J. dissenting). "Landfill" and "pond" "would sit uncomfortably indeed amidst [the] list" of examples in the statutory definition. *Id.*

because EPA failed to distinguish between point sources and nonpoint sources. The court disagreed, noting that the contested limits were applicable to "discharges which are pumped, siphoned or drained," and thus, when read in context with the rest of the rule, applied only to discharges from point sources. *Id.* at 250. Thus, in *Castle*, the Court did not hold, as Sierra Club claims, that *all* discharges from coal storage piles and facilities were discharges from a point source. Rather, at most, the Court held only that discharges which were "pumped, siphoned or drained" from such facilities may qualify as point source discharges. Since the alleged discharges here are not "pumped, siphoned or drained" from CEC, *Castle* is inapposite.

Moreover, *every* other Circuit that has addressed the definition of point source under the CWA follows *Train* and requires some form of channelized conveyance. In the following cases, the presence of a channelized conveyance led the courts to conclude that there was a point source: *Concerned Area Residents for the Env't v. Southview Farm*, 34 F.3d 114 (2d Cir. 1994) (pollutants conveyed by pipe); *Dague*, 935 F.2d at 1354 (pollutants conveyed through a culvert); *Sierra Club v. Abston Constr. Co., Inc.*, 620 F.2d 41 (5th Cir. 1980) (pollutants conveyed through ditches, gullies and similar conveyances); *Serv. Oil. v. EPA*, 590 F.3d 545 (8th Cir. 2009) (pollutants conveyed through city storm sewer pipes); *Trs. for Alaska v. E PA*, 749 F.2d 549, 558 (9th Cir. 1984) (pollutants conveyed through a sluice box); *Earth Sciences, Inc.*, 599 F.2d at 373 (pollutants conveyed through sumps, ditches, hoses and pumps); *Driscoll v. Adams*, 181 F.3d 1285 (11th Cir. 1999) (pollutants conveyed through culverts, pipes and check dams).

Conversely, other Circuits have uniformly rejected claims of a point source in the absence of a channelized conveyance. *See, e.g.*, *Cordiano*, 575 F.3d at 219 (berm considered a container but *not* a conveyance and thus not a point source without some kind of outlet like a pipe or break); *Froebel v. Meyer*, 217 F.3d 928 (7th Cir. 2000) (dam *not* considered a point

source without some kind of outlet like a pipe); *Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1153 (9th Cir. 2010) (mining pits *not* considered a point source); *Woods Knoll, LLC v. City of Lincoln*, 548 Fed. Appx. 577 (11th Cir. 2013) (clearing and grubbing of land *not* considered a point source).

Likewise, the vast majority of district courts that have addressed the issue have also required some form of channelized conveyance to establish a point source. *See, e.g.*, *N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*, 278 F. Supp. 2d 654, 680 (E.D.N.C. 2003) (pollutants conveyed through ditches, sediment traps and gullies); *United States v. Oxford Royal Mushroom Prods.*, 487 F. Supp. 852, 854 (E.D. Pa. 1980) (pollutants conveyed through a specific break in a berm); *Friends of Sakonnet v. Dutra*, 738 F. Supp. 623, 629-30 (D.R.I. 1990) (pollutants conveyed through pipe from a drain field[3]); *Tri-Realty Co. v. Ursinus Coll.*, 124 F. Supp. 3d 418, 459 (E.D. Pa. 2015) (pollutants conveyed through a spillway, pipe and swale); *Fishel v. Westinghouse Elec. Corp.*, 640 F. Supp. 442 (M.D. Pa. 1986) (pollutants overflowed from lagoons and were conveyed via channel to the river); *O'Leary v. Moyer's Landfill, Inc.*, 523 F. Supp. 642 (E.D. Pa. 1981) (pollutants conveyed through gullies, trenches, ditches and broken berms); *Residents Against Indus. Landfill Expansion v. Diversified Sys., Inc.*, 804 F. Supp. 1036, (E.D. Tenn. 1992) (pollutants conveyed through a runoff channel); *Hawaii Wildlife Fund v. Cty. of Maui*, 24 F. Supp. 3d 980 (D. Haw. 2014) (pollutants injected through wells into groundwater that was hydrologically connected to surface water); *Friends of Santa Fe Cty. v. Lac Minerals*, 892 F. Supp. 1333 (D.N.M. 1995) (seepage *not* considered a point source).

---

[3] The only other relevant septic system case did not involve a piped discharge as in *Dutra*, but rather a mobile home park where individual septic systems had been installed directly in waters of the U.S., "thus making a system that is typically a diffuse, non-point source into a point source." *See U.S. v. Lucas*, 516 F.3d 316, 332 n. 43 (5th Cir. 2008).

For example, in *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602 (D. Md. 2011), the alleged point source was a former iron, steel and ship building site that was already the subject of corrective action for soil and groundwater contamination under RCRA.  As here, the plaintiff alleged that pollutants in the soil and groundwater were migrating into the river.  The defendant argued that such migration was not actionable as an unpermitted point source under the CWA and the district court agreed, ruling:

> Plaintiffs allege that hazardous substances have contaminated the soil and groundwater at the Facility and that these hazardous substances are being released in Bear Creek and the Patapsco River. ***Discharge from migrations of groundwater or soil runoff is not point source pollution, however, but nonpoint source pollution.***

*Id.* at 619-20 (emphasis added) (*citing Sierra Club v. El Paso Gold Mines*, 421 F.3d 1133, 1141 n.4 (10th Cir. 2005)); *see also LAC Minerals*, 892 F. Supp. at 1359.

Similarly, in *Mervis Indus. v. PPG Indus.*, No. 1:09-cv-633, 2010 U.S. Dist. LEXIS 32950 (S.D. Ind. Mar. 30, 2010), the plaintiff alleged that arsenic and other pollutants from a landfill at a former glassmaking factory were contaminating soil and groundwater, and that this contamination was leaching and migrating into a neighboring creek in violation of the CWA. Like Sierra Club, the plaintiff did not identify any specific conduit through which pollutants were discharging but instead only alleged migration into groundwater that was hydrologically connected to surface water.  As in *Severstal*, the court rejected this claim, ruling that such migration was not actionable as an unpermitted point source under the CWA:

> Mervis has alleged that PPG landfilled construction materials on the Properties and that the contamination is now leaching and migrating into Wildcat Creek. However, ***Mervis has failed to identify any "defined, discrete conveyance" on the Properties by which pollutants are discharged into Wildcat Creek***, nor has it alleged any facts from which we may infer that pollutants are being discharged via a "defined, discrete conveyance" into Wildcat Creek.  ***A general statement that contaminants are now migrating or leaching into Wildcat Creek is not sufficient to state a claim under the CWA***.

*Id.* at *12-13 (emphasis added).

Finally, in *Greater Yellowstone Coalition v. Lewis*, 628 F.3d 1143 (9th Cir. 2010), the plaintiff challenged the expansion of a phosphate mine, arguing that discharges from the mining pits were unpermitted point sources.  Plaintiff focused on two potential sources of discharge.  The first involved runoff from the top of the mining pits that entered into a stormwater drain system before being discharged.  This runoff, like the runoff from the landfill at CEC, had already been properly permitted, and according to the court, was "exactly the type of collection or channeling contemplated by the CWA."  *Id.* at 1152.  For that reason, the court rejected the claim based on this alleged discharge.  The second potential source of discharge was seepage of water through the mining pits into groundwater that eventually reached surface water.  The court held that this was "nonpoint source pollution because there [was] no confinement or containment of the water" and it was "not collected or channeled."  *Id.* at 1152-53 (*citing Nw. Envtl. Def. Ctr. v. Brown*, 617 F.3d 1176 (9th Cir. 2010)).

### C.  *Yadkin* **Improperly Conflated the Source of the Pollutants With the Conveyance of the Pollutants from the Source.**

Only a handful of federal district court decisions across the country have departed from this majority rule.[4]  These decisions are thinly reasoned, fail to cite to or grapple with the

---

[4] *See Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas*, 141 F. Supp. 3d 428 (M.D.N.C. 2015) (discussed below); *Umatilla Water Quality Protective Ass'n, Inc. v. Smith Frozen Foods, Inc.*, 962 F. Supp. 1312 (D. Or. 1997) (discussed below); *San Francisco Herring Ass'n v. Pac. Gas & Elec. Co.*, 81 F. Supp. 3d 847 (N.D. Cal. 2015) (declining to hold as a matter of law that an entire factory could not be considered a "point source" but noting that many of defendant's arguments would be appropriate grounds for summary judgment, *e.g.*, failure to specify a conveyance, and overly broad designation of an entire site); *N. Cal. Riverwatch v. Mercer Fraser Co.*, No. C-04-4620, 2005 U.S. Dist. LEXIS 42997, at *7-8, 2005 WL 2122052 (N.D. Cal. Sept. 1, 2005) (court ruled that seepage from a man-made wastewater basin *could* constitute a point source, but cautioned that as the litigation moved forward, it would not be sufficient to allege groundwater pollution and then assert a general hydrological connection to surface water; instead, pollutants must be traced from their source to the surface water).

prevailing precedent, and cannot be squared with the text of the statute.  For example, Sierra Club relies heavily on *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas*, 141 F. Supp. 3d 428 (M.D. N.C. 2015).  To be sure, like this case, *Yadkin* involves coal ash stored at an electric generating facility.  The allegations and procedural posture in *Yadkin*, however, are quite different, involving a number of claims not present here, including claims of unpermitted "seeps" and groundwater impacts unaddressed by corrective action.  Further, in *Yadkin*, the state was pursuing enforcement for overlapping violations, in stark contrast to this case, where the state deems Dominion to be in compliance with all applicable laws and permits, including groundwater corrective action requirements.

On the specific issue of the presence of a point source, *Yadkin* devoted a scant one paragraph of analysis.  In that single paragraph, the court reasoned that the coal ash lagoons were designed to hold accumulated coal ash in the form of liquid waste and thus "appear to be confined and discrete."  *Id.* at 443-44.  The court went on to conclude that because the lagoons were allegedly unlined and leaking, they were "conveying pollutants" and thus fell within the definition of point source.  *Id.*

The problem with the analysis in *Yadkin* is that it conflates the source (*i.e.*, the lagoons) with the conveyances *from* the source *to* the surrounding surface water.  In effect, the court ascribed "confined and discrete" to the source itself, and then considered non-specific leakage from the source to serve as the "conveyance."  Under the court's reasoning, the statutory definition would need to be "confined and discrete <u>source</u> <u>with</u> <u>a</u> conveyance" as opposed to "confined and discrete conveyance."  Since you can draw a circle around any source, however big (a facility, a city, etc.), and since water necessarily must be conveyed in some fashion from every source (whether in, on, through, under, or out in some other manner), *Yadkin* overlooked

the single most important principle articulated by the Fourth Circuit in *Train*, and echoed by every other Circuit to address the issue around the country – that the conveyance itself must be channelized (*i.e.*, "discernible, confined and discrete") in order to be a point source.

Indeed, although binding Fourth Circuit precedent requires that a point source must be collected and channeled, *Yadkin* failed to cite to, or reconcile, either *Train* or *Costle*.  Instead, it cited cases that do not actually stand for – or support – its conclusion.  The first case, *Umatilla Water Quality Protective Ass'n, Inc. v. Smith Frozen Foods, Inc.*, 962 F. Supp. at 1320, described an unlined brine pond as a "confined and discrete conveyance."  *Yadkin* acknowledged, however, that this statement was dicta, since the *Umatilla* court had already decided the case on other grounds (specifically, that discharges through hydrologically connected groundwater to surface water were ***not*** subject to the CWA).  The second case cited in *Yadkin*, *United States v. Alpha Nat. Res., Inc.*, Civil Action No. 2:14-11609, 2014 U.S. Dist. LEXIS 165842 (S.D. W. Va. Nov. 26, 2014), involved a proposed consent decree resolving alleged exceedances of NPDES permit limits.  There, defendant's NPDES discharges emanated from "various impoundments and settlement ponds, outlets, ditches and other conveyances that qualify as 'point sources' emitting 'pollutants' as those two terms are defined under federal law for [CWA] purposes."  *Id.* at *2.  The presence or absence of point sources, however, was not disputed in either the consent decree or the case itself; nor were any other facts adduced to explain *how* water was discharged *from* the impoundments and ponds.  Thus, the case simply cannot stand for the proposition that impoundments and ponds are, themselves, point sources.

The remaining cases cited in *Yadkin* reflect the prevailing view that the definition of point source should be interpreted broadly.[5]  However broad the definition may be, there must be "an outer limit to what may constitute a 'point source.'"  *Ursinus*, 124 F. Supp. 3d at 459 (emphasis added) (citation omitted).  For example, "a discharge of pollutants into navigable waters occurring only through ***migration of groundwater*** and uncontrolled soil runoff represents 'nonpoint source' pollution and is outside the scope of the CWA."  *Id.*

> D.  **EPA has Never Promulgated a Rule Stating that Unlined Ponds or Landfills are Point Sources under the CWA.**

EPA has the primary responsibility for adopting rules to implement the CWA, approving the delegation of permitting authority to the states, and overseeing state permitting programs to ensure that they are consistent with the statute.  *See, e.g.*, 33 U.S.C. §§ 1361, 1342(b); 1342(c)(3).  Over the 44 year history of the CWA, EPA has ***never*** promulgated a final rule that says unlined ponds or landfills are point sources, or that the migration of pollutants from such ponds or landfills through hydrologically connected groundwater to surface water is a point source subject to the NPDES permit program.  In addition, over the 41 year history of Virginia's EPA-approved and delegated permit program, EPA has never objected to, or "vetoed" a state-issued VPDES permit on grounds that DEQ should have regulated an unlined pond or landfill as a point source, or the migration of pollutants from such a pond or landfill through hydrologically connected groundwater to surface water.

At trial, Sierra Club attempted to undermine the testimony of the DEQ Director of Operations, James Golden, by showing him snippets of *Federal Register* Notices from EPA and

---

[5] *Yadkin* cited *Ohio Valley Envtl. Coal, Inc. v. Hernshaw Partners, LLC*, 984 F. Supp. 2d 589 (S.D. W. Va. 2013) to support this view.  The facts of *Hernshaw*, however, cut against Sierra Club and support Dominion's position that a point source must have a channelized conveyance.  In *Hernshaw*, the court concluded that the toe of a valley fill associated with surface coal mining was a point source because, by design, it had the effect of collecting, channeling and conveying water from the fill.

then asking him to concede that he was not familiar with them.[6]   Sierra Club repeated these authorities in its post-trial brief.  What Sierra Club failed to reveal – either at trial or in its brief – is that those *Federal Register* Notices have no force of law and are irrelevant to the point source issue in this case.

The first Notice, 56 Fed. Reg. 64,876 (Dec. 12, 1991), involved a final rule to amend the water quality standards applicable to federally-recognized Indian Reservations.  In the *preamble* to the rule, as part of its response to comments on its earlier proposed rule, EPA stated that "the [CWA] requires NPDES permits for discharges to groundwater where there is a direct hydrological connection between groundwaters and surface waters.  In these situations, the affected groundwaters are not considered 'waters of the United States' but discharges to them are regulated because such discharges are effectively discharges to the directly connected surface waters."  *Id.* at 64,892.  Preamble language has no legal effect.  *See NRDC v. EPA*, 559 F.3d 561, 564-565 (D.C. Cir. 2009) (*citing* Federal Register Act, 44 U.S.C. § 1510(a)-(b)) (only the text of the rule itself, as published in the Code of Federal Regulations, has legal effect).  Even assuming it did, this preamble language does not stand for the proposition that Sierra Club asserts.  EPA's statement in the Notice hinges on the occurrence of a discharge, and the statutory definition of "discharge" requires the addition of a pollutant from a "point source."  33 U.S.C. § 1362(12).  In short, the preamble still requires a point source discharge, *i.e.*, one that is collected and channeled, rather than one that is diffuse and haphazard.

---

[6] Mr. Golden was authorized to testify at trial on DEQ's behalf regarding the permit programs relevant to this case.  Trial Tr. vol. IV, 790:11-25, June 24, 2016 (Test. of James Golden).

The second Notice, 66 Fed. Reg. 2960 (Jan. 12, 2001), involved a proposed rule to establish permitting requirements for concentrated animal feeding operations (CAFOs).[7] In the *preamble* to the proposal, EPA "restated" its interpretation that the CWA applies to "discharges of pollutants *from a point source* via groundwater that has a direct hydrologic connection to surface water." *Id.* at 3015. (emphasis added). Again, a statement in a preamble has no legal effect. Further, like the first Notice, this statement does not advance Sierra Club's position that diffuse migration of pollutants through groundwater to surface water constitutes a point source.

### E. EPA Agrees that a Point Source Must be a Conveyance.

Surprisingly, Sierra Club overlooks EPA's most recent pronouncement on this issue, as reflected in the Brief for the United States as Amicus Curiae in Support of Plaintiffs-Appellees in *Hawaii Wildlife Fund v. County of Maui*, currently pending on appeal to the Ninth Circuit, Docket No. 15-17447, at 11, ECF No. 40 (May 31, 2016). At issue in that case were discharges of wastewater into four on-site injection wells that were piped to groundwater that was hydrologically connected to surface water. The district court granted plaintiffs' motion for

---

[7] CAFOs are specifically included as point sources in the statutory definition for unique reasons. Wastewater generated from CAFOs is commonly routed to impoundments and then "land applied" as fertilizer on farm fields. EPA's regulation of CAFOs focuses on the land application process to ensure that the wastewater is not excessively or incorrectly applied. The proposed rule cited by Sierra Club led to a final rule, 68 Fed. Reg. 7176 (Feb. 12, 2003), which was challenged and eventually resulted in the Second Circuit's decision in *Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486, 510 (2d Cir. 2005). In that decision, the court explained why CAFOs were treated differently by Congress, and also why CAFOs mark the only departure from the prevailing view that a point source must be collected and channeled. "[W]hether the land application run-off has been 'collected' or 'channelized' at the land application area is irrelevant to the determination regarding whether such run-off constitutes a CAFO discharge. To be sure, the Act does generally contemplate that discharges be 'channelized' in order to fall within the EPA's regulatory jurisdiction; that is why the term 'point source' is defined as 'discrete, discernible, conveyances.' However, a CAFO is, itself, a 'channel' under the Act – it is, of course, expressly included in the list of examples of the types of 'point sources' the EPA may regulate." *Id.* at 510. Ultimately, the court vacated portions of EPA's final rule, including a requirement that CAFOs obtain NPDES permits regardless of whether they actually discharge.

partial summary judgment, but that is not surprising since the injection system meets the classic definition of a point source (*i.e.*, a "discernible, confined and discrete conveyance"). The case is more notable for the district court's holding that a plaintiff must demonstrate more than a general hydrological connection between groundwater and surface water. Rather, the court held, a plaintiff must show that pollutants can be directly traced from the specific point source (there, the injection wells) to the ocean, and must show that the level of pollutants emerging into navigable-in-fact water is more than *de minimis*. *Hawaii Wildlife Fund*, 24 F. Supp. 3d at 997-98. Sierra Club has shown no such specific point source or discharge of more than *de minimis* pollutants here.

In its amicus brief, EPA confirmed its view that the injection wells are the point source, not the wastewater treatment facility, holding ponds, or the groundwater itself. Brief of Amici Curiae United States at 2, *Hawaii Wildlife Fund v. County of Maui*, No. 15-17447 (9th Cir. Dec. 12, 2015). No similar discrete conduit is present at CEC. Dominion FOF ¶¶ 76-79, 168, 171. EPA went on to acknowledge that even under its broad interpretation of hydrologically connected groundwater, "some hydrological connections are too circuitous and attenuated to come under the CWA." *Id.* at 12. EPA opined that this determination was "a factual inquiry, like all point source determinations," and would be affected by many site-specific factors, including time, distance, geology, flow, slope, traceability, and evidence that the pollutant can or does reach jurisdictional surface waters. *Id.* at 26.[8] Here, Sierra Club has not met its burden on any of these factors. *See George v. Residorf Bros.*, 696 F. Supp. 2d 333 (W.D. NY 2010)

---

[8] In *Maui*, EPA and the state conducted a ***tracer-dye study*** that confirmed there was a direct conduit between the injection wells and the ocean. *Id.* at 6. The study also showed that a majority of the injected wastewater followed this conduit. *Id.* at 27. Sierra Club has offered nothing similar here. To the contrary, Sierra Club's experts admit the absence of any direct conduit, referring instead to general, diffuse and haphazard radial flows of groundwater outward from CEC to the surrounding surface water. Dominion FOF ¶¶ 75-77.

(rejecting CWA citizen suit when the only data plaintiff adduced were from groundwater wells that were not waters of the United States).

For the reasons presented in its Opening and Reply Memoranda in Support of its Motion to Dismiss, Dominion maintains that EPA's position is incorrect as a matter of law, and that even point source discharges to groundwater that is hydrologically connected to surface water fall outside of the CWA. Mem. in Supp. of Def.'s Mot. to Dismiss (ECF No. 5) at 19-23 and Reply in Supp. of Def.'s Mot. To Dismiss (ECF No. 14) at 3-9.  *See also Cape Fear RiverWatch, Inc. v. Duke Energy Progress, Inc.*, 25 F. Supp. 3d 798, 810 (E.D.N.C. 2014) (ruling that Congress did not intend for the CWA to extend federal regulatory authority over groundwater, regardless of whether that groundwater is eventually or somehow "hydrologically connected" to navigable surface waters).  Even if the Court holds otherwise, Sierra Club must still establish the existence of a point source, which it has failed to do.

As Mr. Golden testified, DEQ position is that neither an unlined pond or landfill, nor the diffuse migration of pollutants from such a feature through groundwater to surface water is a point source subject to permitting under the CWA.  Dominion FOF ¶¶ 80, 170.  Instead, DEQ regulates such groundwater impacts through the state's solid waste regulatory program.  *Id.* ¶¶ 36, 44, 173-174, 180.  As described in more detail below, DEQ's interpretation is entitled to deference.  It is consistent with the text and plain meaning of the CWA, and EPA has never issued a final rule or decision to the contrary.

Without a "point source," this Court simply cannot reach the issue to which Sierra Club devotes most of its argument – whether the CWA extends to hydrologically connected groundwater.  The ponds and landfill at CEC may store coal ash, but unlike the pipes, pumps, siphons, hoses, sumps, culverts, ditches, spillways, sewers, trenches, injection wells and outlets

16

at issue in the substantial majority of point source cases, the ponds and landfill are not conveyances in and of themselves, and Sierra Club has not alleged any discernible conveyances *from* them other than diffuse groundwater migration.  Such diffuse migration is unquestionably not "discernible, confined and discrete."

## II.      DEQ's Decisions are Entitled to Deference

### A.      DEQ has the Delegated Authority to Administer the CWA in Virginia.

Sierra Club cites *Chevron v. NRDC*, 467 U.S. 837 (1984) for the proposition that this Court should defer to "EPA's longstanding position" on hydrologically connected groundwater. But *Chevron* only applies where there is a statutory ambiguity, and here, as described in Section I, there is none.  Even if there were, there is no EPA rule (or even formal guidance) on point and thus no basis for deference.[9]   Instead of deferring to random, non-binding, and irrelevant preamble statements from EPA, this Court should defer to DEQ's longstanding and consistent interpretations and practice as the agency with primary responsibility for implementation the NPDES permit program in Virginia.

While EPA initially administers the NPDES permitting system for each state, a state may seek a transfer of permitting authority.  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 650 (2007).  If authority is transferred, then the state – not EPA – has the primary responsibility for reviewing and approving NPDES permits, subject to continuing EPA oversight.  *Id.*   This is the case in Virginia, where the Commonwealth maintains an EPA-approved NPDES permit program, "pursuant to which [DEQ] issues permits that suffice for both

---

[9] If anything, EPA's decision not to object to any of the VPDES permitting actions at CEC *should* be given deference, since EPA is responsible for ensuring that state permits are consistent with the Clean Water Act and any decision not to object reflects EPA's considered judgment that a permit *is* consistent with the Act.

state and federal discharge authorization." *United States v. Cooper*, 482 F.3d 658, 661 (4th Cir. 2007) (citing Va. Code Ann. § 62.1-44.15(5a)).

**B.    Pursuant to its Delegated Authority, DEQ has Chosen to Regulate Diffuse Groundwater Impacts under Virginia's Solid Waste Program Rather than the VPDES Permit Program.**

Applying its delegated CWA authority, DEQ has made two determinations that are central to the issues before the Court, both of which Sierra Club assiduously ignores.  First, DEQ does not consider the diffuse migration of pollutants to surface water through groundwater to be a point source discharge.  Trial Tr. vol. IV, 794:19-25, 795:1-9, June 24, 2016 (test. of James Golden).  Second, DEQ considers Dominion to be in compliance with all applicable regulatory requirements and permits for the CEC site.  *Id.* at 802:17-20, 803:23-25, 804:1-2.  DEQ's determinations are based on its interpretation and application of the rules governing groundwater and surface water impacts (including EPA's rule regarding the disposal of coal combustion residuals, which has been adopted into Virginia's solid waste regulatory program),[10] the plain language of the permits, and the extensive data collected by Dominion and submitted to DEQ over the past 13 years.  Dominion FOF ¶¶ 10, 81-165.

Instead of regulating diffuse groundwater impacts under the VPDES permit program, DEQ has chosen to do so under the state's solid waste regulatory program and the Waste Permit that is specifically applicable to CEC.  Dominion FOF ¶¶ 36, 44, 173-174, 180.  These authorities prescribe detailed groundwater monitoring and corrective action requirements.  *See* Va. Code Ann. § 10.1-1402; 9 VAC 20-81-250(A)(2)(a); 9 VAC 20-81-250(A)(6)(b)(4)(b)(iii). The State Water Control Law, under which the VPDES Permit was issued, does not.  Rather, the

---

[10] 80 Fed. Reg. 21,301 (Oct. 19, 2015) (codified at 40 C.F.R. pts. 257 and 261); 9 VAC 20-81. *See also* Trial Tr. vol. IV, 815:2-8, June 24, 2016 (test. of James Golden) (EPA's position in the coal combustion residuals rule reinforces DEQ's historic practice of addressing groundwater impacts in waste permits and surface water impacts in VPDES permits).

VPDES permit program regulates the "discharge of pollutants," which DEQ defines to mean "any addition of any pollutant or combination of pollutants *to surface waters from any point source*…." 9 VAC 25-31-10 (emphasis added).

Faced with an analogous question of whether the gradual seepage of pollutants from waste disposal areas was actionable under the State Water Control Law, even though it was already subject to corrective action under the state's solid waste regulatory program, the Virginia Supreme Court had no difficulty concluding that it was *not* actionable. "Given the specific and all-embracing coverage under the [Virginia Waste Management Act] and [the Solid Waste Management Regulations] of the occurrences at issue in this case, we conclude that the General Assembly intended such occurrences to be governed *exclusively* by the VWMA." *Campbell Cty. v. Royal,* 720 S.E.2d 90, 99 (Va. 2012) (emphasis added).

DEQ's determination that Dominion is "in compliance" is based, in part, on the complementary nature of the two permits and DEQ's clear intent that the two permits operate in tandem to comprehensively regulate the entire CEC site.  DEQ's determination is supported by the rules of contract interpretation,[11] pursuant to which the specific language of Part I.D.7 in the VPDES permit trumps the general provisions in Parts II.F and II.R.[12]  The "except as expressly authorized" language in Part I.D.7 explicitly reserved to DEQ the right to regulate groundwater impacts through the Waste Permit, precisely as it has done at CEC.[13]

---

[11] Courts interpret the terms of permits according to principles of contract interpretation.  *See Piney Run Pres. Ass'n v. Cty. Comm'rs*, 268 F.3d 255, 269 (4th Cir. 2001); *Condo. Servs. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 281 Va. 561, 573 (2011) ("Furthermore, a specific provision of a contract governs over one that is more general in nature.").

[12] These provisions are set forth in full in Dominion's Findings of Fact ¶¶ 33-35.

[13] The Waste Permit authorizes the documented groundwater impacts at CEC subject to the corrective action plan that is incorporated into, and enforceable through, the permit.  Dominion FOF ¶ 172; *see also* FOF ¶ 54.

## C.     DEQ's Regulation of Groundwater Impacts at CEC is Entitled to Deference.

Sierra Club argues that the Court should ignore or reject DEQ's interpretations, practice and conclusions.  Applicable law, however, calls for the opposite result.  DEQ's decisions are entitled to deference.  *See Daniels v. Brown*, 550 Fed. Appx. 138, 139-40 (4th Cir. 2013) ("Decisions of a state agency implementing federal law should be afforded deference, in an effort to 'uphold the letter of federal law while allowing agencies the discretion to perform their function of reasonably administering the federal program.'" (quoting *Clark v. Alexander*, 85 F.3d 146, 150 (4th Cir. 1996)).

The degree of deference to be afforded an agency's findings is very high where the findings involve that agency's particular technical expertise.  *Ctr. for Marine Conservation v. Brown*, 917 F. Supp. 1128, 1143 (S.D. Tex. 1996) (describing the standard to be applied by a court when reviewing an agency action within the agency's "own sphere of expertise" as "very deferential"); *see also Ohio Valley Envt'l Coal. v. Bulen*, 429 F.3d 493 (4th Cir. 2005) (the U.S. Army Corps of Engineers' decision to issue a general permit authorizing the discharge of dredged or fill material from surface coal mining and reclamation projects and related interpretation of the CWA was entitled to deference); *Sierra Club v. Energy Future Holdings Co.*, No. W-12-CV-108, 2014 U.S. Dist. LEXIS 75447 (W.D. Tex. Mar. 28, 2014) (deference given to permit writer's determination that instances of excess emissions by a power plant alleged by the plaintiffs to be in violation of the Clean Air Act fell under the safe harbor provided for in the power plant's emissions permit and related state regulations).

Moreover, courts must adhere to "'the strong public policy against a federal court's interference in state agency determinations absent some finding that the agency has violated federal law.'"  *S. Appalachian Mountain Stewards v. Red River Coal Co.*, No. 2:14CV24, 2015 U.S. Dist. LEXIS 48483, at *12 (W.D. Va. Apr. 13, 2015) (quoting *United States v. Alcoa, Inc.*,

No. A-03-CA-222-SS, 2007 U.S. Dist. LEXIS 14330, at *7 (W.D. Tex. Feb. 27, 2007)).  *Red River Coal Co.* is particularly instructive.  There, Sierra Club and other environmental groups alleged that the defendant was violating certain general conditions in its NPDES permit, relying exclusively on data and information gathered by the defendant and submitted to the state.  As in this case, the state did not share Sierra Club's interpretation of the permit and did not believe that the defendant was in violation.   As here, Sierra Club implicitly challenged the state's interpretation of the permit.  The defendant produced evidence of the state's interpretation and the opinions of agency officials that it was in compliance.  On the basis of that evidence, the court entered summary judgment for the defendant.  Sierra Club appealed, but during the pendency of the appeal, the state reissued the permit, revising the conditions and so the appeal was dismissed as moot.  *Red River Coal Co.*, 2015 U.S. Dist. LEXIS 48483, *appeal dismissed*, No. 15-1522 (4th Cir. Jan. 6, 2016).

Here, Sierra Club's allegations hinge on interpretations of the CWA and DEQ's regulatory program that are inconsistent with DEQ's interpretations and practice.   DEQ does not believe there are any discharges at CEC that are either unpermitted or in violation of the permit. Dominion FOF ¶¶ 24, 37, 175, 181; *see also* Dominion FOF ¶ 88 (In fact, DEQ has not seen any surface water monitoring data indicating that arsenic in the groundwater at CEC is being released to surface waters).  Further, EPA, in its oversight of DEQ's program and its review of DEQ's permits, has not determined that DEQ's interpretations violate the CWA.   Thus, DEQ's interpretations are entitled to deference by this Court.

Deference is particularly appropriate for permitting decisions made under the CWA, as the regulatory framework is "exceedingly 'complex and requires sophisticated evaluation of complicated data.'"  *Crutchfield v. Cty. of Hanover*, 325 F.3d 211, 218 (4th Cir. 2003) (quoting

*Trinity Am. Corp. v. EPA*, 150 F.3d 389, 395 (4th Cir. 1998)).   A court is not empowered to substitute its judgment for that of the permitting agency and does not otherwise "sit as a scientific body . . . meticulously reviewing all data under a laboratory microscope." *Id.* (quoting *Nat. Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1401 (4th Cir. 1993).[14]

It is painfully apparent that Sierra Club does not support DEQ's permitting decisions at CEC (or DEQ's interpretation of the underlying state and federal regulatory requirements) and does not believe that the current remedial approach of monitored natural attenuation ("MNA") under the Waste Permit is adequate.   But DEQ's regulations, guidance, practice, and trial testimony present a rational and defensible justification for DEQ's decision to address surface water impacts under the VPDES Permit and groundwater impacts under the Waste Permit.   9 VAC 20-81-250 and 260; *see*, *e.g.*, Dominion FOF ¶¶ 36, 80, 170.   They also justify DEQ's decision to approve MNA, at least as an initial step in the corrective action process.   Dominion FOF ¶¶ 50-59, 165; *see also id.* ¶¶ 155-164. The pending permit renewals show that DEQ is continuing to actively oversee site conditions and reveal that DEQ will be requiring additional remedial actions from Dominion, in concert with closure of the Bottom Ash Pond and Landfill. *Id.* ¶¶ 39-43, 60.

---

[14] *See also Upper Blackstone Water Pollution Abatement Dist. v. EPA*, 690 F.3d 9, 26 (1st Cir. 2012) (where the permit writer "follows the proper procedures and acts with a reasonable basis, both its choice of scientific data and interpretation and application of that data to real world conditions are entitled to deference." (citations omitted)).   If the permitting agency "fully and ably explains its course of inquiry, its analysis, and its reasoning sufficiently enough for [a court] to discern a rational connection between its decision-making process and its ultimate decision,'" the decision should stand.   *Crutchfield*, 325 F.3d at 218 (quoting *Trinity Am. Corp.*, 150 F.3d at 395)); *see also Kennecott v. EPA*, 780 F.2d 445, 449 (4th Cir. 1985) ("The court best acts as a check on agency decisionmaking [sic] by scrutinizing process and by determining whether 'the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

It is here that principles of deference, Burford abstention and primary jurisdiction intersect. Sierra Club wants this Court to reject DEQ's interpretations, find liability where DEQ sees none, and impose its own court-order remedy, notwithstanding that DEQ is in the midst of two permitting actions (one for the VPDES Permit and another for the Waste Permit) that specifically include conditions (1) requiring Dominion to evaluate, report on, and implement additional remedial options under the Waste Permit, subject to approval and oversight by DEQ, and (2) making the relevant requirements of the Waste Permit enforceable through the VPDES Permit. *Id*.

The Burford abstention doctrine provides a sound basis for this Court to defer to DEQ. As stated in *New Orleans Public Services, Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989) (quoting *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813 (1976)), this doctrine provides as follows:

> Where timely and adequate state court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."[15]

Although Sierra Club does not agree with DEQ's current permitting approach and may not agree with the proposed revisions, the public comment period is open for Sierra Club to raise its objections, and state law affords Sierra Club the right to seek administrative and judicial

---

[15] Alternatively, under the common law doctrine of primary jurisdiction, the Court has the discretion to refer the issues in this case to the specialized competence of DEQ, which is exercising continuing jurisdiction over these very same issues. *See Friends of Santa Fe County*, 892 F. Supp. at 1348-49.

review of any final permitting decisions.  This set of circumstances is quintessentially ripe for abstention to DEQ and the state administrative process.

## III.   The Requested Relief is Not Appropriate

### A.   Penalties Are Neither Mandatory Nor Appropriate

Sierra Club argues that penalties are mandatory in the event that the Court finds Dominion liable for violations of the CWA, but Sierra Club is relying on the wrong section of the statute.  *See Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 52-53, 55 n.1 (1987) (clarifying that the penalty provisions of CWA §§ 309(d) and 505(a) are separate and distinct, and that the language in § 505(a) related to "any appropriate civil penalties" gives courts discretion not to impose penalties ***in citizen lawsuits***).

In any event, the statutory penalty factors in CWA § 309(d) are relevant as a guide and counsel strongly against the imposition of any penalties.  As the Court acknowledged during closing argument, Dominion has demonstrated itself to be a good corporate citizen, has done everything that DEQ has required of it, and has consistently been deemed by DEQ to be in compliance with all applicable regulations and permit requirements.  Trial Tr. Vol. IV 966:7-14. Sierra Club wants this Court to rule that the VPDES Permit prohibits what the Waste Permit regulates, effectively putting Dominion in a "regulatory double jeopardy" that would be illogical not to mention unconstitutional.[16]  Dominion has experienced no economic benefit from the alleged violations, and there have been no avoided costs through non-compliance.  It would violate basic principles of due process to impose penalties when Dominion had no basis or warning to know that it was in violation or susceptible to a claim of violation.  Moreover, there

---

[16] *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996) ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.").

has been absolutely no showing of harm to the environment from any of the discharges that Sierra Club alleges to be unlawful.[17]  Dominion FOF ¶¶ 183-191.

**B.     Excavation is Not Appropriate**

"The law is well settled that federal injunctive relief is an extreme remedy granted in only the most compelling circumstances." *Raub v. Campbell*, 3 F. Supp. 3d 526, 540 (E.D. Va. 2014).  Before the Court may enter injunctive relief, Sierra Club must satisfy a four-factor test, proving: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).  Each of these four factors weighs against the injunctive relief Sierra Club seeks.

**Irreparable Injury.**  In environmental cases, the Supreme Court has found that the "standard requires plaintiffs . . . to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008).  As the Fourth Circuit has stated, in order for an injunction to be appropriate in a CWA case, a plaintiff "must show a substantial likelihood of environmental damage outside the boundaries of the [defendant's project area] to warrant issuance of the preliminary injunction."  *Nat. Res. Def. Council v. Watkins*, 954 F.2d 974, 983 (4th Cir. 1992).

---

[17] *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of N.Y.*, 244 F. Supp. 2d 41, 50 (N.D.N.Y. 2003) ("[T]he lack of material environmental harm was a significant mitigating factor."); *Atl. States Legal Found., Inc. v. Universal Tool & Stamping Co.*, 786 F. Supp. 743, 749 (N.D. Ind. 1992) ("[T]he court will consider the lack of material environmental harm as a significant mitigating factor."); *Haw.'s Thousand Friends v. City & Cty. of Honolulu*, 821 F. Supp. 1368, 1395-96 (D. Haw. 1993) (same).

Here, it is undisputed that there is *no* harm to human health or the environment whatsoever.   Dominion FOF ¶¶ 183-191.   "[A] conjectural injury cannot warrant equitable relief."   *Morales v. TWA*, 504 U.S. 374, 382 (1992) (Scalia, J.).   All evidence indicates that the surface waters surrounding CEC are well below the water quality criteria for arsenic, that every sample of surface water over the past 13 years has been well below that standard, and that the standard is designed to be protective of human health and the environment.   Dominion FOF ¶ 180.   The *only* testimony in this case concerning the potential environmental and human health impacts of arsenic at CEC was from Dominion's expert witness Christopher Teaf, Ph.D, a toxicologist and faculty member of Florida State University since 1979.   Dr. Teaf testified that following his review of surface water, sediment, pore water, and fish tissue data (which included benthic species and filter feeders), he concluded there was no "human health or environmental concerns around the CEC facility."   *Id.* ¶ 185.   Dr. Teaf's testimony was unchallenged by Sierra Club, which presented absolutely no testimony or evidence of harm.

Absent such evidence, Sierra Club does not meet the threshold requirement for injunctive relief.   See *Nat'l Parks Conservation Ass'n v. U.S. Forest Serv*., Civil No. 15-1582, 2015 U.S. Dist. LEXIS 167747, at *4 (D.D.C. Dec. 8, 2015) ("If a party fails to make a sufficient showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors.").   The Court need look no further and may deny relief on this basis alone. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[W]e require the moving party to demonstrate at least 'some injury' . . .  since 'the basis of injunctive relief in the federal courts has always been irreparable harm.'")).

**Adequate Legal Remedies.** If the Court finds a violation of the CWA, the appropriate legal remedy is to require Dominion to obtain NPDES permit coverage, which, of course, Dominion has already done. In the seminal case of *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982), the Supreme Court addressed a remarkably similar set of facts. There, the Navy had been found to be in violation of the CWA for discharging ordnance (*e.g.*, munitions, etc., which are considered "pollutants") into navigable waters without an NPDES permit. As here, these discharges had "not harmed the quality of the water." *Id.* at 307. As the Supreme Court recounted, "[r]ecognizing that violations of the Act 'must be cured,' the District Court ordered the Navy to apply for an NPDES permit. *Id.* at 309 (citation omitted). However, the District Court refused to enjoin the discharges, finding that the Navy's "technical violations" were not causing any "appreciable harm" to the environment. *Id.* at 310. The petitioners challenged this approach, but the Supreme Court found it appropriate.

The Supreme Court explained that "an injunction is an equitable remedy. It is not a remedy which issues as of course or to restrain an act the injurious consequences of which are merely trifling." *Id.* at 311-12 (citations omitted). Rather, "[a]n injunction should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable." *Id.* (citation omitted). With these principles in mind, the Supreme Court found that the CWA's purpose to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" would be "achieved by compliance with the Act, including compliance with the permit requirements." *Id.* at 314-15. Thus, since the "discharge of ordnance had not polluted the waters," the District Court's decision to not enjoin the discharges did not mean that it had "ignored the statutory violation [or] undercut the purpose

and function of the permit system." *Id.* at 315. Rather, the District Court "ordered the Navy to apply for a permit," and this was sufficient to remedy the violation. *Id.*

Other courts have followed this approach. *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1294 (1st Cir. 1996) ("The most important component of the Act is the requirement that an NPDES permit be obtained."); *W. Va. Highlands Conservancy, Inc. v. Huffman*, 651 F. Supp. 2d 512, 529 (S.D. W. Va. 2009) (ordering defendant to apply for and obtain NPDES permit); *W. Va. Highlands Conservancy. Inc. v. Huffman*, 588 F. Supp. 2d 678, 693 (N.D. W. Va. 2009) (same); *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1164 (D. Idaho 2012) (directing defendant to "come into compliance" with the NPDES program).

**Balance of Hardships.**   Balancing the hardships "requires an assessment of the harms facing both parties." *E.I. Dupont De Nemours & Co. v. Kolon Indus.*, 894 F. Supp. 2d 691, 708 (E.D. Va. 2012).   In balancing hardships, "[a] court may balance environmental preservation with economic harms, such as the loss of revenue . . . and related economic impacts." *Conservation Cong. v. U.S. Forest Serv.*, 803 F. Supp. 2d 1126, 1133 (E.D. Cal. 2011); *Krichbaum v. U.S. Forest Serv.*, 991 F. Supp. 501, 507 (W.D. Va. 1998) (same).

Here, the evidence adduced at trial was that the cost to excavate and dispose of the 66-acres of coal ash at the CEC site is over $600 million, and $475 million for the smaller 44-acres that does not include the adjacent Columbia Natural Gas (CNG) property.[18]   Sierra Club's cost witness, John Pardue, Ph.D. was unreliable and not credible.   Dr. Pardue had never done cost

---

[18] Dominion does not own a significant portion of the peninsula on which the coal ash is situated. In 1970, Dominion transferred to CNG the northern portion of the peninsula.   CNG is not a party to this case.   Dominion cannot be held liable for discharges over which it has no ownership or operational control.   *See Friends of Sakonnet v. Dutra*, 738 F. Supp. 623, 632 (D.R.I. 1990); *W. Va. Highlands Conservancy, Inc. v. Huffman*, 651 F. Supp. 2d 512 (S.D. W. Va. 2009); No. 10-cv-5105, 2014 U.S. Dist. LEXIS 93420, at *37-38 (N.D. Cal. July 9, 2014).

estimating before, ignored or did not know key elements of the costs to excavate and dispose, and inaccurately accounted for other estimates. Dominion FOF ¶¶ 200-216.

As explained above, Sierra Club did not put on *any* evidence of harm, while the costs of excavation to Dominion and Virginia rate-payers are significant. This factor weighs against injunctive relief.

**Public Interest.** As the Fourth Circuit has stated, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction." *Pashby v. Delia*, 709 F.3d 307, 329-30 (4th Cir. 2013) (quoting *Winter*, 555 U.S. at 24; *Weinberger* 456 U.S. at 312). Here, even if the Court finds a violation of the CWA, injunctive relief provides little if any benefit to the public. Rather, the high costs of the relief Sierra Club seeks would result in a detriment to the public in the form of higher electricity costs, not to mention the impact from transporting ash on public roads. Moreover, the public interest is served by stability in the regulatory framework that DEQ has employed in its regulation of the CEC site. That is, if the Court were to find a CWA violation, this finding would represent a considerable shift in how DEQ has understood the VPDES and Waste permitting framework. It would send a shockwave across the Commonwealth and require DEQ to reexamine its regulations and permitting procedures to ensure that similar permits at other facilities (*e.g.*, landfills, wastewater basins, stormwater retention/detention ponds, septic leach fields), meet the Court's finding. This factor also weighs against injunctive relief.

Even if the Court finds a violation, it should refer the matter to DEQ to issue any necessary permit or permit revision commensurate with the Court's findings. Doing so would be consistent with other CWA citizen suits, and would show appropriate deference to DEQ, as the agency primarily responsible for overseeing and implementing the CWA in Virginia. *See*, *e.g.*,

*Legal Envtl. Assistance Found., Inc. v. Hodel*, 586 F. Supp. 1163, 1169 (E.D. Tenn. 1984) (finding defendants in violation of the CWA but not imposing either an injunction or civil penalties, instead ordering the defendants to file for and seek NPDES permit coverage for the unpermitted discharges with all deliberate speed).

## CONCLUSION

For the foregoing reasons, Dominion respectfully requests that this Court dismiss Sierra Club's lawsuit with prejudice; order that Sierra Club pay Dominion's reasonable attorney fees; and order such other relief as the Court deems just and proper.

VIRGINIA ELECTRIC AND POWER COMPANY
D/B/A DOMINION VIRGINIA POWER

By:    /s/ Laura Anne Kuykendall
       Of Counsel

Brooks M. Smith (VSB No. 40171)
Dabney J. Carr, IV (VSB No. 28679)
Miranda R. Yost (VSB No. 72711)
Laura Anne Kuykendall (VSB No. 82318)
**TROUTMAN SANDERS LLP**
1001 Haxall Point
P.O. Box 1122
Richmond, Virginia 23218-1122
Telephone: 804-697-1200
Facsimile: 804-697-1339
brooks.smith@troutmansanders.com
dabney.carr@troutmansanders.com
miranda.yost@troutmansanders.com
la.kuykendall@troutmansanders.com

*Counsel for Defendant Virginia Electric*
*and Power Co. d/b/a Dominion Virginia Power*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of July, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which then will send automatic notification of such filing (NEF) to the following:

> Deborah M. Murray
> Bradford T. McLane
> Christopher J. Bowers
> Gregory Buppert
> William C. Cleveland
> Nathaniel H. Benforado
> Southern Environmental Law Center
> 201 West Main Street, Suite 14
> Charlottesville, VA 22902-5065
> dmurray@selcva.org
> bmclane@selcva.org
> cbowers@selcga.org
> wcleveland@selcva.org,
> gbuppert@selcva.org
> nbenforado@selcva.org

> _____/s/ Laura Anne Kuykendall_____
> Laura Anne Kuykendall (VSB No. 82318)
> **TROUTMAN SANDERS LLP**
> 1001 Haxall Point
> P.O. Box 1122
> Richmond, Virginia 23218-1122
> Telephone: 804-697-1200
> Facsimile: 804-697-1339
> la.kuykendall@troutmansanders.com
> *Counsel for Defendant Virginia Electric and Power*
> *Company d/b/a Dominion Virginia Power*